J.S07031/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  G.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.S. | : | |
| | : | |
| | : | No. 1489 MDA 2015 |

Appeal from the Order Entered August 11, 2015
in the Court of Common Pleas of Lancaster County,
Juvenile Division, No(s): CP-36-DP-0000099-2015

BEFORE:  BOWES, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MARCH 17, 2016**

A.S. ("Mother") appeals from the order dated August 10, 2015, and entered on August 11, 2015, granting the petition filed by the Lancaster County Children and Youth Social Service Agency ("CYS" or the "Agency") to adjudicate G.K. ("Child"), born in August of 2010, dependent, remove him from the custody of Mother, and to place him in foster care, pursuant to sections 6302 and 6351 of the Juvenile Act, 42 Pa.C.S. §§ 6302 and 6351. We affirm.

The trial court set forth the following factual history:

> [Child] was born [in August of 2010].  He is autistic and non-verbal.  (N.T. 75, 7/23/2015)  He has also been diagnosed with IBD [("inflammatory bowel disease")] and colitis, and suffers serious symptoms connected with those illnesses.  (*Id* at 77)  After receiving a report on January

_____

[*] Former Justice specially assigned to the Superior Court.

29, 2014, the Agency investigated and learned that domestic violence was ongoing between the parents, which gave them concern for [Child]'s safety. The family was accepted for services and family service plans were developed for both Mother and [P.K. ("Father")]. . . . The parties separated in March of 2014. [Child] lives with Mother. [Father] lives with a friend in Red Lion[.] (*Id* at 117)

Trial Ct. Op., 10/1/15, at 2 (footnote omitted).

The trial court stated:

The family, A.S. (Mother), P.K. (Father) and [Child,] age 5, first came to the attention of the Lancaster County Court on May 13, 2015 when a Petition for Protective Custody was filed, alleging that [Child] was in imminent risk of foster care placement absent protective services. A hearing was scheduled for June 4, 2015, but that hearing was then continued to July 23, 2015 at Father's request.[1] A CASA [Court Appointed Special Advocate,] [Kara Good,] was appointed on June 11, 2015.

_____

[1] The June 4 hearing was before another Judge who heard no testimony and the CASA was also appointed by the other judge.

*Id.* at 1.[1]

On July 23, 2015, the trial court held a hearing on the dependency petition. At the hearing, the Agency's counsel, Attorney David Natan, Esq., Mother's counsel, Attorney Justin Gearty, Esq., Father's counsel, Attorney Daniel Shertzer, Jr., Esq., and the guardian *ad litem* ("GAL"), Attorney Jeffrey Shank, Esq., were present. The CASA, Kara Good, was also present,

_____

[1] The trial court stated that Mother also has a teenage son who lives elsewhere and is not part of this matter. *Id.* at 2 n.2.

- 2 -

as were both parents. The Agency presented the testimony of Patrick McBrearty, a behavioral specialist employed by the Chester County Intermediate Unit who works with Child. N.T., 7/23/15, at 7-8. Next, the Agency presented the testimony of Mary Woomer, the director of the daycare where Child attends. *Id.* at 25. The Agency then presented the testimony of Mother as on cross-examination.

Next, the Agency presented the testimony of Teresa Nichtman, the Therapeutic Support Staff worker for Home and Community Services assigned to Child. *Id.* at 101-02. She interacts with Child every school day, either at daycare or in the school. *Id.* at 102. Ms. Nichtman also testified that she has seen Child in his home with Mother and, at times, with his behavioral specialist. *Id.* The Agency then presented the testimony of Father as on cross-examination. Finally, the Agency presented the testimony of Kelley Zipp, the Director of the Family Support Department of the Agency, who has been involved with Child's family. *Id.* at 135.

The trial court explained the subsequent procedural history as follows:

> The July 23[rd] adjudication/disposition hearing was continued to August 3, 2015, because of insufficient time to complete testimony. On July 24[th], 2015, the [c]ourt ordered that the parents could not reside together, could not engage in abusive behavior, had to cooperate with the Lancaster County Children and Youth Social Service Agency (Agency) caseworker in assessment of child safety and permit access to [Child] to the caseworker, the GAL and the CASA[,] which information was given orally at the hearing. A Petition for temporary custody was filed by the Agency on July 31, 2015. The August 3[rd] hearing was continued to August 10, 2015 because of insufficient time

to complete testimony.  On August 4th, [Child] was moved from his emergency placement to a more permanent facility.

\*    \*    \*

After the July 23rd hearing, the [c]ourt ordered Mother and Father to make [Child] accessible to the Agency so that his safety could be assessed.  Despite that order, [Child] remained inaccessible to the Agency.  He was not taken to daycare/school even though Mother assured he would be[,] and Mother refused to respond to numerous telephone calls or speak to the caseworkers.  The final event which led to [Child]'s being removed from Mother's house took place on July 30, 2015[,] when the caseworker saw [Child] at daycare/school.  [Child] had marks on his neck and scratches on his chest.  The caseworker [Kareema Hernandez] went to Mother's home and, despite clear signs that someone, probably Mother, was at home, no one would answer the door.  Faced with a non-verbal child with unexplained bruises and an uncooperative parent, the worker called the police, who took [Child] into protective custody.  (N.T. 10-11, 8/3/2015)

Trial Ct. Op. at 1-3.

At the hearing on the dependency petition on August 3, 2015, the Agency presented the testimony of Kareema Hernandez, the Agency ongoing caseworker assigned to Child's case.  N.T., 8/3/15, at 4-5.  Father's counsel presented Father's testimony.  He then presented the Agency's Family Support Department Director, Ms. Zipp, as on cross-examination.  Mother's counsel questioned the Agency Family Support Supervisor, Susan Murray, as on cross-examination.  *Id.* at 107.

At the hearing on the dependency petition on August 10, 2015, counsel for the Agency, Attorney Natan, noted on the record that Mother

was not present. N.T., 8/10/15, at 3. Mother's counsel, Attorney Gearty, explained that Mother had come to the courthouse and had become sick, but she had left and did not wish to have the hearing continued. *Id.* at 3-4. Mother's counsel and Father's counsel, Attorney Caprice Hicks Bunting, conducted cross-examination of Ms. Murray, and the Agency counsel conducted re-direct examination. Mother's counsel also presented the testimony of the Agency family support caseworker who became involved with the family on July 23, 2015, Natalie Krak. *Id.* at 42-43. Father's counsel and the Agency counsel conducted cross-examination of Ms. Krak.

On August 11, 2015, the trial court entered the adjudication order, dated August 10, 2015, finding Child dependent under section 6302 of the Juvenile Act, as without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. The trial court also found that it was in Child's best interest to be removed from Mother's home and placed in the legal and physical custody of the Agency in his foster care placement.

On September 2, 2015, Mother filed a notice of appeal, along with a concise statement of matters errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In her brief on appeal, Mother raises the following issues:

> 1. Whether the trial court erred and abused its discretion by finding the child dependent based off of 1. a prior history of domestic violence and 2. Hearsay allegations of

improper medical care with no evidence of any medical provider reporting medical negligence?

2. Whether the court erred and abused its discretion by awarding the Agency physical custody of the child?

Mother's Brief at 2.

Initially, we note that Mother waived the second portion of her first issue by failing to preserve it in her brief with discussion supporting the argument and citation to case law. "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived. Arguments not appropriately developed include those where the party has failed to cite any authority in support of a contention." *Lackner v. Glosser*, 892 A.2d 21, 29-30 (Pa. Super. 2006) (citations omitted); *see also Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006) (stating, "[i]t is well settled that a failure to argue and to cite any authority supporting any argument constitutes a waiver of issues on appeal").

Our Supreme Court set forth our standard of review for dependency cases as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

- 6 -

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010); *see also In re A.B.*, 19 A.3d 1084, 1093-1094 (Pa. Super. 2011) (stating that this Court will not infringe upon the juvenile court's credibility determinations).

> An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused.

*Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007). Additionally, "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G., T.*, 845 A.2d 870, 872 (Pa. Super. 2004).

Section 6302 of the Juvenile Act defines a "dependent child" as a child who:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. **A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]**

42 Pa.C.S. § 6302(1) (emphasis added).

Section 6341(a) and (c) of the Juvenile Act provides in pertinent part:

> **(a) General rule.**—After hearing the evidence on the petition the court shall make and file its findings as to whether the child is a dependent child. . . .
>
> * * *
>
> **(c) Finding of Dependency.—** If the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case.

42 Pa.C.S. § 6341(a) and (c).

In ***In re D.A.***, 801 A.2d 614 (Pa. Super. 2002), a panel of this Court stated:

> [A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617. "The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care or control, and if so, whether such care and control are immediately available." *Id.* at 619 (citation omitted).

Mother argues that the trial court erred and abused its discretion in finding Child dependent, and awarding the Agency legal and physical custody

of Child. Mother asserts that there was a history of domestic violence in the parental home, but that she had sought a PFA order against Father in September of 2014, and had obtained a one-year PFA order against Father in December of 2014. She states that Ms. Nichtman, Child's TSS worker, testified that there was an instance in February of 2015 at Child's school in which Child was having behavioral issues that Ms. Nichtman attributed to Child having witnessed domestic violence. Mother asserts that Ms. Nichtman was not qualified to render such an opinion, and, in fact, agreed that Child had behavioral issues that would make it difficult to determine the cause of any particular behavioral issues.

Mother did not preserve any objection to Ms. Nichtman's testimony as improper opinion testimony on the record at the hearing on July 23, 2015. In fact, the following exchange took place when Mother's counsel, Attorney Gearty, questioned Ms. Nichtman on cross-examination.

Mr. GEARTY:

* * *

Q All right. And the issues on February 27, would they be much different than what any other child would be expressing that was experiencing his parents divorcing?

MR. NATAN: Objection. That calls for speculation.

MR. GEARTY: She offered an opinion as to the reason why these –

THE COURT: I'm going to sustain because you haven't laid a foundation that that – this is the first I've heard of it,

and whether anything was given to the child and whether the child could understand, so I'm going to sustain.

N.T., 7/23/15, at 112-13.

Mother's counsel attempted to question Ms. Nichtman for an opinion as to whether Child's reaction at school was different from the reactions of children at school whose parents were divorcing. Mother's counsel did not object to Ms. Nichtman offering an opinion; rather, he sought an opinion from the witness, and the court sustained the objection raised by the Agency's counsel. Thus, Mother has waived her argument that Ms. Nichtman was not qualified to give her opinion as to the cause of Child's behavior. *See* Pa.R.A.P. 302 (stating, "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Moreover, Mother has failed to support this contention with any argument or citation to caselaw, and, therefore, has waived the issue for that reason, as well. *See* *Chapman-Rolle*, 893 A.2d at 774; *Lackner*, 892 A.2d at 29-30.

Further, Mother claims that, in May of 2015, when Father appeared at her home where Child resided, she enforced the PFA order by contacting the police. Mother states that all of the Agency witnesses agreed that she has provided excellent care for Child, and the behavioral specialist testified that Child was making good progress. Mother claims that she was meeting Child's particular needs, and that there was no testimony that she placed Child's safety at risk. She argues that the Agency was asking the court to find Child dependent because of future contact Mother might have with

- 10 -

Father that could result in domestic violence and possibly have a negative effect on Child. She contends that the Agency's evidence was too speculative to satisfy the Agency's burden of proof that Child lacked proper parental care and control by clear and convincing evidence. In support of her argument, Mother cites *In the Interest of T.M.*, 689 A.2d 954 (Pa. Super. 1997).

In *In the Interest of T.M.*, the agency presented testimony regarding two episodes of domestic violence in the parental home. The evidence showed that there had been initial concerns about the infant child's health, but the hospital had returned the child to the mother after medical testing did not reveal any medical evidence of abuse of the child. The trial court granted the parents' joint demurrer.

On appeal by the agency, this Court found that, although there was testimony regarding the two incidents of domestic violence, there was nothing medically wrong with the child based on the medical testimony, and there was no evidence that the mother was abusive or neglectful toward the child. The panel stated that there was a lack of clear and convincing evidence that the child was without proper parental care or control as defined in the Juvenile Act. Accordingly, the panel affirmed the trial court order. *Id.* at 957.

Instantly, we incorporate the trial court's factual findings set forth in the trial court opinion, filed pursuant to Pa.R.A.P. 1925(a), regarding

domestic violence in the parental home and the risk it posed to Child's safety from the testimonial evidence at the hearings on the dependency petition. Trial Ct. Op. at 3-11. We find *In the Interest of T.M.* inapposite to the present case, as the facts of that case were quite different. Here, Mother and Father have a lengthy history of domestic violence and PFA orders, yet Mother continues to allow Father to interact with her in the presence of Child, who is autistic and non-verbal. The Agency has had problems with accessing Child, especially after an Agency witness noticed unexplained bruises on his body.

Mother asserts that as she took action to enforce the PFA order against Father, it is contrary to public policy to use the May 2015 incident as a factor in the dependency proceedings. Mother's Brief at 9-10. Mother contends, without any case support, that a parent is not under any obligation to provide access to the home to the government, and to allow the government to interfere with their ability to parent. *Id.* at 11. She nevertheless asserts that there were no concerns with the home during earlier visits and no unexplained bruises or other concerns with Child noticed during any visit. *Id.* Mother argues that Ms. Zipp's testimony regarding the concern of what might happen in the future is inappropriate, as the standard is whether the child is currently without proper parental care and control. *Id.* Mother posits, "[i]f the standard was based off of what may or may not happen in the future, then nearly every child in this Commonwealth could end up being

considered to be a dependent child." ***Id.*** Accordingly, Mother argues that the Agency failed to establish that Child was presently without proper parental care and control by clear and convincing evidence. ***Id.*** at 7-12.

The trial court rejected Mother's argument, explaining as follows:

> The [c]ourt finds that [Child] is a dependent child. He is autistic, with severe deficits in his understanding of his world and his interaction with the people around him. His behavior and his emotions can be abnormally volatile if he finds his surroundings disturbing. The testimony establishes that his parents' violent behavior qualifies as one of these disturbing triggers and that his parents have been involved in such behavior for a number of years. In fact, the TSS's testimony drew a solid connection between a fight between Mother and Father and abnormal and disruptive behavior on [Child]'s part.
>
> If the parents are separated and one of them is appropriate to care for [Child], then the child cannot be found to be dependent. The court must therefore look at them separately in order to determine which, if either, is capable of providing the proper parental care as contemplated by the statute above. The [c]ourt does not consider Father to be available as an appropriate parent, finding him to be a non-credible witness in relation to his denials of his violent behavior, his drinking, and his lack of contact with the Agency. To accept Father's testimony, the [c]ourt would have to believe that only Father is telling the truth and all other witnesses describing his behavior are lying. That is not a logical or acceptable conclusion.
>
> The [c]ourt does not find Mother to be an appropriate parent under the statutory definition of dependency. [Child] is clearly a very difficult child to parent. He is easily emotionally distressed, has frequent "melt-downs", cannot communicate verbally, needs a TSS with him in school constantly. Both Mother and Mr. McBreaty told the court that [Child] needs a well[-]structured, calm, familiar environment to keep his behavior on an even keel. This is one of the arguments Mother used against putting [Child] in foster care – that moving him around would put him in a

- 13 -

confusing, unstable, unfamiliar setting. Despite this knowledge, for years Mother has allowed herself to be the victim of Father's violence, sometimes in [Child]'s presence, which would disturb [Child] painfully and initiate violent and aberrant behavior in him. For years she has filed and withdrawn multiple Protection From Abuse petitions against Father, thereby allowing Father to initiate situations disturbing to [Child]. She allowed her last PFA order to be modified without court involvement, so that she and Father could be in [Child]'s hospital room alone, despite a history that establishes their being together as fostering a hostile and risky situation for the child. She was complicit in Father's violations of the PFA Order. This is a mother who places her own desire for contact with her husband above her child's vital need to calm and quiet. This is a mother who did what she wanted to such an extent that [Child] was placed in threatening situations. This is a mother who, knowing her son could remain in foster care without her cooperation, with the Agency, decided not to cooperate. Mother cannot be trusted to do the right thing for [Child]'s physical and emotional health. Her behavior puts [Child] in the position of a child without the proper parental care necessary for his physical, mental or emotional health. Mother needs to take action to place herself in the position of being able to care for [Child]. Without that action, [Child] is at risk while living with her.

The requirements of the definition of "dependent" have been met. [Child] has been without appropriate parenting from both parents defined in the statute. [Child] is a dependent child.

\*    \*    \*

For the reasons set out above, [the trial court] affirms its decision that [Child] is a dependent child, and that the evidence appropriately indicates that it was in his best interest to remove him from his parent's [sic] home.

Trial Ct. Op. at 12-14, 17.

After careful review, we find no merit to Mother's argument, as Child's

physical, mental, and emotional health or morals is the concern of the court

in the dependency proceedings. We find that there was sufficient, clear and convincing evidence to support the trial court's determination, in its August 10, 2015 adjudication, that Child was without proper parental care and control, that such proper parental care and control was not immediately available from his parents, and that he should be adjudicated a dependent child. The trial court's findings of fact and credibility determinations are supported by the record, as are the trial court's inferences and conclusions of law regarding the need to adjudicate Child dependent and remove him from the care and custody of his parents for his safety. *See In re R.J.T.*, 9 A.3d at 1190.

In her second issue, Mother argues that even if Child was properly adjudicated dependent, Child's best interests would be served by ordering the physical custody of Child be with her because of his special needs. Mother states that she had been Child's caregiver for Child's entire life. She asserts that the Agency did not seek physical custody until after a caseworker noted a brush burn on his neck. Mother states that the Agency did not take Child to a physician, and Father explained the injury. Mother complains that Child needs consistency and that removing Child from her—Child's primary caregiver, who has ensured his safety—would be contrary to Child's best interests. Mother's Brief at 4. Mother cites *In the Interest of Pernishek*, 408 A.2d 872 (Pa. Super. 1979), in support of her contention

that a dependent child shall not be removed from his parents unless such separation is "clearly necessary." Mother's Brief at 13.

Regarding the placement of a child, a panel of this Court stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent. . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of the Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." *In re E.F.V.*, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983).

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006).

Here, the trial court addressed Mother's argument with evidence supporting its conclusion that Mother "cannot be trusted to do the right thing for [Child]'s physical and emotional health." Trial Ct. Op. at 13-14. The record supports the trial court's conclusions and inferences. Thus, in view of our standard of review as set forth in *In re R.J.T.*, 9 A.3d at 1190, we cannot disturb the findings and credibility assessments of the trial court. We find no abuse of discretion in adjudicating Child dependent, and removing him from the care and custody of Mother, maintaining him in foster care placement. Accordingly, we affirm the trial court order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2016

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
JUVENILE DIVISION

IN RE:                                          :

                                                :  Docket No: CP- 36-DP-0000099-2015

G. K., a minor                                  :

                                                :  SUPER. CT. NO: 1489 MDA 2015

BY: GORBEY, J.

**OPINION SUR APPEAL**

PROCEDURAL HISTORY

The K. family, A. S. (Mother), P. K. (Father) and G. K. (G.) age 5, first came to the attention of the Lancaster County Court on May 13, 2015 when a Petition for Protective Custody was filed, alleging that G. was in imminent risk of foster care placement absent protective services. A hearing was scheduled for June 4, 2015, but that hearing was then continued to July 23, 2015 at Father's request.[1] A CASA was appointed on June 11, 2015. The July 23rd adjudication/disposition hearing was continued to August 3, 2015, because of insufficient time to complete testimony. On July 24th, 2015, the Court ordered that the parents could not reside together, could not engage in abusive behavior, had to cooperate with the Lancaster County Children and Youth Social Service Agency (Agency) caseworker in assessment of child safety and permit access to G. to the caseworker, the GAL and the CASA which information was given orally at the hearing. A Petition for temporary custody was filed by the Agency on July 31, 2015. The August 3rd hearing was continued to August 10, 2015 because of

---

[1]The June 4 hearing was before another Judge who heard no testimony and the CASA was also appointed by the other judge.

insufficient time to complete testimony.[2]  On August 4th, G. was moved from his emergency placement to a more permanent facility.

The continued adjudication/disposition hearing was held on August 10, 2015, after which this Court found the child to be dependent and ordered that it was in the best interest of the child to be removed from Mother's home.  Mother did not attend the hearing on August 10, 2015.  On September 2, 2015, Mother filed an appeal of the August 10th Order to the Pennsylvania Superior Court, pursuant to which this opinion is being prepared.

## FACTUAL HISTORY

G. K. was born on August 30, 2010.[2]  He is autistic and non-verbal. (N.T. 75, 7/23/2015)  He has also been diagnosed with IBD and colitis, and suffers serious symptoms connected with those illnesses. (*Id* at 77)  After receiving a report on January 29, 2014, the Agency investigated and learned that domestic violence was ongoing between the parents, which gave them concern for G.'s safety.  The family was accepted for services and family service plans were developed for both Mother and Father. The parties separated in March of 2014.  G. lives with Mother.  Mr. K. lives with a friend in Red Lion (*Id* at 117)  After the July 23rd hearing, the Court ordered Mother and Father to make G. accessible to the Agency so that his safety could be assessed.  Despite that order, G. remained inaccessible to the Agency.  He was not taken to daycare/school even though Mother assured he would be and Mother refused to

---

[2]Mother also has a teenage son, who lives elsewhere and is not part of this matter.

2

respond to numerous telephone calls or speak to the caseworkers. The final event which led to G.'s being removed from Mother's house took place on July 30, 2015 when the caseworker saw G. at daycare/school. The child had marks on his neck and scratches on his chest. The caseworker went to Mother's home and, despite clear signs that someone, probably Mother, was at home, no one would answer the door. Faced with a non-verbal child with unexplained bruises and an uncooperative parent, the worker called the police, who took G. into protective custody. (N.T. 10-11, 8/3/2015) The domestic violence in the K. house was not a new development starting in 2014. When she testified on July 23, 2015, Mother presented a long list of violent events that had taken place.[3] She had received a Protection from Abuse Order in 2007. (*Id* at 41) That matter was resolved by the parties and the order was dismissed later in that year. ( *Id.* At 44). Mother filed another petition for a PFA in December of 2009. ( *Id* at 45) The allegations of violence in that petition were that Father, in a rage, spit in Mother's face, and threw her on the floor so that she hit her head on a coffee table or a wall. He then hit her on her stomach so that she fell down a few stairs, after which he slammed her head into the wall. He then grabbed a gun and said that he was going to shoot her. (*Id* at 46-47) In March of 2010, Mother again chose not to pursue the PFA action to completion. *Id* at 49. She filed another PFA action in December of 2013. (*Id* at 50). In support of that petition, Mother alleged that Father threatens to kill her on a daily basis and that on December 20th, 2013, he specifically threatened to put a bullet in her head. She also included that the weekend prior to the petition, Father had grabbed her by the

---

[3]Father and Mother both testified as if on cross examination during the July 23rd hearing, despite Mother's attorney's objection which was overruled by the Court.

3

arms, leaving bruises. She described Father as abusive and lacking in self-control. (Id at 51-53) The Court entered a temporary order, but eleven days later she asked to have the action dismissed. In February of 2014, the police removed Father from the home after seeing marks on Mother's face and neck from his attempt to choke her. On September 13, 2014, Father had punched her in the face while she held G. in her arms; the punch also grazed G.'s eye, causing swelling. Father violated the PFA order again on the Monday after Mother's Day in 2014 when he came to the house to obtain personal items. Mother and G. were both there. She refused to let him in, they argued and she called the police. He retaliated by putting a dent in her garage door. He pled guilty to violation of the order and received four months of probation, during which he was not to be within 100 feet of Mother. (Id at 70-72.) In June of 2014, Father restrained her against the wall and floor, causing injuries to her neck which required medical attention. In December of 2014, Mother filed for another PFA, alleging that Father had been carrying G. in a way that threatened to bang G.'s head against the doorway trim. A similar incident had occurred on another occasion and when she had tried to comfort a crying G., Father had pushed and hit her, grabbed the back of her neck, and shoved her against the wall, all the while holding G. over his shoulder. ( Id at 56) When Mother managed to take hold of G., she noticed a bump on his head. In August of 2014 G. had vomited after his head hit a chair as a result of rough play with Father. Mother also alleged that two months previously, Father had punched her in the face, causing her head to hit the door frame and bleed. Mother attempted to minimize the effect of her testimony by saying that Father had not intentionally hit G. and by insisting that she only filed the last PFA at the insistence of the Agency caseworker,

4

who threatened her with the loss of her son if she did not do so. However, she also agreed under questioning at hearing that there were other violent incidents which had not been memorialized in PFA petitions. This last filing resulted in a final protection order, under which G. was a protected person. Father was excluded from Mother's residence, and she was given custody of G., with provisions for visitation for Father. That order was in place until June of 2015, when it expired. (*Id* at 55-62)

Despite the foregoing history, Mother testified that she has no concerns about Father being around G.. (*Id* at 64) She had agreed to a modification of the PFA Order in effect in the summer of 2015 that removed the requirement of third party supervision between Father and G.. (*Id.* At 65) Mother explained to the Court that she had agreed to the modification because of G.'s serious health issues. He has been inpatient at Hershey Medical Center, Children's Hospital of Philadelphia and Lancaster General Hospital during his short life. Mother and Father could not be in the same hospital room together, because their hostile behavior was unsettling for him. But then Mother decided that the seriousness of his illnesses required that he needed both parents, and it wasn't fair for one to have to leave when the other one arrived. She denied that the real reason for the modification was to obviate the threat made in court that G. would be placed if Father was found at her home. Additionally, although Father had violated the order by being at her home at her request on July 8, 2015, she explained that she had invited him there to be involved in a meeting to discuss G.'s kindergarten placement and to sign the necessary papers. (*Id* at 69)

Theresa Nitchman, G.'s therapeutic support staff (TSS) person, testified that on February 27, 2015, she found G. quite agitated at daycare. She called the Agency in

5

response to advice from both G.'s behavioral specialist and her own agency. She reported that "G. was agitated and aggressive in daycare. He tried to bite the teacher, pushed and kicked the TSS, threw objects across the room." She added that he was not normally that aggressive and she believed that his behavior was related to something disturbing he had experienced. This perception was validated by Mother, who at pick up time showed the TSS a fist-sized bruise on her chest resulting from an altercation with Father; G. had been present, and had been negatively affected by the event. Mother told her that G. had acted "skittish" with her that morning, flinching when she went to bring him to daycare. ( *Id* at 107-108, 113-115)

When Father testified, he denied the physical violence described by Mother, admitting only to the kind of arguments that any other couple would have. (*Id* at 118) He denied any incident in which he left marks or bruises on his wife or that necessitated medical help and he did not even recall being in the house on February 27, 2015. He told the Court that he and Mother met "a couple of times" at his boat so he could take G. swimming, in violation of the PFA order. (*Id.* At 122-123) He asserted that he was taking domestic violence counseling on his own accord. He admitted to drinking in the past, and added that it had influenced his behavior in that "things that maybe might not normally bother you, somebody would bother me or whatever, it might have culminated into, you know, may have bothered me, I guess, or whatever you can say. I mean, not really seeing the reality of the situation." He admitted to having two deer rifles and three shotguns in his possession. Father blamed Mother's friends, who didn't like him, for calling the police. (*Id* at 127) And he emphasized that the police calls, though numerous, were for "alleged" domestic violence, which never really happened. *(Id* at

6

129) He accused the Agency for never calling him back so that he's been kept out of the loop, and asserted that his work schedule made it difficult to go to the Agency. Father said he had called the Agency approximately 36 times; the Agency testified they had not received any messages. ( *Id* at 128) An Agency worker also testified to the number of times someone had spoken with Father on the phone, contradicting Father's testimony. (*Id* at 22 *et seq*)

The Agency Family Support Supervisor testified about the Family Service Plans prepared for the parents. Mother was asked to cooperate with all Agency services, to communicate with the Agency concerning changes affecting G., to provide a safe and stable environment for G., to provide financial information, to address any substance abuse, mental health or concerns for the violence issues and to demonstrate effective parenting skills and complete a parenting program approved by the Agency. She informed the Court that there had been a previous referral for a personalized parent training program for Mother from which Mother had been unsuccessfully discharged. Mother had also blocked the Agency's access to her home or to G. through not answering her door, not being home for scheduled visits, and keeping G. inaccessible. (*Id* at 143, N.T. 5-10, 8/3/15) Father's plan goals are to cooperate with Agency services, to provide financial information, have an assessment of any substance abuse, mental health concerns or violence issues, participate in counseling and a parenting program, and follow any other recommendations. (N.T.140-143, 8/3/15))

Patrick McBrearty, a behavior specialist with the Chester County Intermediate Unit has been working with G. since August of 2013. He describes G. as being autistic "somewhere in the moderate range, so [that] his inability to communicate effectively

7

presents a lot of behavioral issues, aggression, tantrums......Also, due to the autism, he has a lack of awareness of the environment and safety issues, so he will wander – you know, he needs a constant one-to-one supervision. In answering a question concerning G.'s relationship with his father, McBrearty said :

"I think sometimes when I go there, he thinks I'm his dad, so he runs up and does the same thing that he does with his dad that I've seen him do in the past, you know he puts his arms up because people pick him up and then spin him around and do a little thing with him......It's hard to determine if G. is close to anybody. You know, he's – he pairs people with things, you know, so when he sees his dad, he does that. You know, when he sees his mom, he has certain ritualistic behaviors with the people he knows.

(*Id* at 15) In response to a question about the child's behavior, McBrearty said:

"He has autism. He sometimes becomes overexcited. Sometimes when he's at daycare and it's time for a nap, he's not ready, so he'll do everything he can to avoid a nap and he'll jump on the furniture or rip a book or things like that. But nothing unusual for, I think, a child of his level and functioning". (*Id* at 16)

. . . . . . . . . . .

"G. is a difficult child. I mean, he's – his overall lack of awareness, you know, he, not purposely runs, but wanders away. He's always hungry, or seems to be, and so he, you know, part of his frustration and tantrum is he can't ask for the things he wants...." (*Id* at 17)

Mother described his behavior in terms of his having meltdowns. (*Id* at 75)

Communication with G. is clearly difficult. Non-verbal, he is learning signs as a method of communication, and anyone dealing with him has to learn his signs. (*Id* at 22) His TSS must always be with him at daycare. (*Id* at 32) G.'s physical health is problematic with the presence of IBD and colitis. At the July 23rd, 2015 hearing, Mother testified that he is bleeding internally and a procedure to ascertain the reason was scheduled for the day after the hearing. (*Id* at 77)[4] Management of his illnesses

---

[4]This procedure was actually performed a week later, because of the death of Mother's brother.

8

appears to be difficult because he cannot communicate his pain and/or distress. (*Id* at

78)  He must wear leg braces because of a problem with his walk.  (*Id* at 75)

Everyone seems to be in agreement that G. needs structured routine and

predictable environments.  McBrearty explained:

[G.'s moods change.  You know, I'll get reports from the TSS that he's had a
rough day.  You know, and that could be due to lack of sleep, he doesn't like certain
foods, but then he'll grab foods from other kids' plates that eventually he doesn't like.
....[We need to get him and in a consistent setting where the responses to his behavior
are consistent and therapeutic.

................................

[Transitional issues with kids with autism are huge.  You know, they like
predictable things and structured routine and predictable environments, and when that
changes, there's a risk of increase in behavior, because I can't communicate...what's
going on here, why the change. (*Id* at 23)

The parents' actions since G.'s placement has not been helpful to the goal of

reunification.  Mother has not appropriately maintained contact with the Agency.

Scheduling time with her for updates or for home visits has been very difficult.  She

signed releases to allow her caseworker from the Agency to communicate with her

domestic violence counselor and some of G.'s providers, and then, when the Agency

filed its petition, she revoked the releases.  (*N.T.* 80. 7/23/2015)  Her home, which

belongs to Father, is in foreclosure.  Her utility payments are behind.  On August 7,

2015, she asked the Agency for $1,100 to pay her electric bill.  (N.T. 114, 8/3/15; N.T.

38, 8/10/15)  She lives on money from Mr. K., Social Security Disability for G. and an

inheritance.  Mother had been involved with a Personalized Parent Training program

and Domestic Violence Services, but was terminated by both; the reason given by the

former was Mother's lack of cooperation.  Despite the scheduling difficulties

surrounding her brother's funeral and the use of his death to keep caseworkers away

9

from G., it turned out that Mother has strained relations with her siblings and was not permitted to attend the funeral. (*Id* at 70-71) During interviews, the caseworker found Mother's conversation and information to be inconsistent and confusing.

Hershey Medical Center has reported that they are concerned about Mother's lack of follow-through with their medical guidelines necessary for G.'s health. G. missed an appointment on April 17, 2015 without notice. Despite instructions to have lab work done monthly, the last time such work was done was in May of 2015. A stool sample which was to have been submitted in June of 2015, was not returned. (*Id* at 55) Mother had changed the dosage of one of G.'s medications without consulting his physician. (*Id* at 58) On August 6, 2015, Father and the caseworker took G. to see Dr. Alexander, G.'s gastroenterologist. (*Id* at 55) Despite having been notified of the appointment, Mother did not attend. Dr. Alexander was concerned about inconsistencies between his prescriptions and the medications G. was actually taking. (*Id* at 56-58) The child was supposed to be on two medications, but Mother was giving him only one. (*Id* at 59) The Agency also learned on that day that G. only has one diagnosis – IBD – of which colitis is a subset, but not Crohn's. (*Id* at 60) There was also some question as to whether G. had had bleeding from his rectum, since the results of the procedure to determine the source of the bleeding were normal. Dr. Alexander had requested that Mother bring in pictures of all of G.'s diapers, but she did not appear for the appointment. No one other than Mother and Father had seen blood on the diapers. (*Id* at 58) Prior to the G.'s hospital procedure, Mother told the caseworker that G. may have to go to surgery directly after his examination and remain in the hospital for a

10

week. A physician later told the worker that was never part of the medical plan. *Id* at 69-70. She appeared in an agitated state the day of G.'s procedure, taking multiple pictures of the child. She made calls to her attorney. She made vituperative statements to the caseworker and had to be told to calm down a number of times. (*Id* at 67-68)

Father, who is forbidden custody because of the PFA Order has not complied with any aspects of his plan in a manner verifiable to the Agency.

## ISSUES

1. Whether the Court erred in finding a five year old child dependent when the child is severely autistic, non-verbal, easily emotionally disturbed by events surrounding him, and the parents have a long history of domestic physical violence, the child has been physically injured by that violence on at least one occasion, and emotionally affected on another, and the parents continue to have contact despite the existence of a Protection from Abuse order, Mother has difficulty in staying separated from Father, the abuser, and has refused to follow all of the child's doctor's instructions concerning care of the child who also suffers from a severe intestinal disease.

2. Whether the Court erred in allowing Mother and Father to be called to testify by the Agency as the Agency's witness on cross-examination.

3. Whether the Court erred in considering hearsay testimony regarding missed medical appointments.

11

## ANALYSIS

### Issue 1

A "dependent child" is defined, in relevant part, as one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk." 42 Pa.C.S.A. §6302. "The question of whether a child is lacking proper parental care and control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control are immediately available." *In re M.W.* 842 A.2d 425, 428 (2004).

The Court finds that G. K. is a dependent child. He is autistic, with severe deficits in his understanding of his world and his interaction with the people around him. His behavior and his emotions can be abnormally volatile if he finds his surroundings disturbing. The testimony establishes that his parents' violent behavior qualifies as one of these disturbing triggers and that his parents have been involved in such behavior for a number of years. In fact, the TSS's testimony drew a solid connection between a fight between Mother and Father and abnormal and disruptive behavior on G.'s part.

If the parents are separated and one of them is appropriate to care for G., then the child cannot be found to be dependent. The court must therefore look at them separately in order to determine which, if either, is capable of providing the proper parental care as contemplated by the statute above. The Court does not consider

12

Father to be available as an appropriate parent, finding him to be a non-credible witness in relation to his denials of his violent behavior, his drinking, and his lack of contact with the Agency. To accept Father's testimony, the Court would have to believe that only Father is telling the truth and all other witnesses describing his behavior are lying. That is not a logical or acceptable conclusion.

The Court does not find Mother to be an appropriate parent under the statutory definition of dependency. G. is clearly a very difficult child to parent. He is easily emotionally distressed, has frequent "melt-downs", cannot communicate verbally, needs a TSS with him in school constantly. Both Mother and Mr. McBrearty told the court that G. needs a well structured, calm, familiar environment to keep his behavior on an even keel. This is one of the arguments Mother used against putting G. in foster care – that moving him around would put him in a confusing, unstable, unfamiliar setting. Despite this knowledge, for years Mother has allowed herself to be the victim of Father's violence, sometimes in G.'s presence, which would disturb G. painfully and initiate violent and aberrant behavior in him. For years she has filed and withdrawn multiple Protection from Abuse petitions against Father, thereby allowing Father to initiate situations disturbing to G.. She allowed her last PFA order to be modified without court involvement, so that she and Father could be in G.'s hospital room alone, despite a history that establishes their being together as fostering a hostile and risky situation for the child. She was complicit in Father's violations of the PFA Order. This is a mother who places her own desire for contact with her husband above her child's vital need for calm and quiet. This is a mother who did what she wanted to such an extent that G. was placed in threatening situations. This is a mother who, knowing her son could

13

remain in foster care without her cooperation with the Agency, decided not to cooperate. Mother cannot be trusted to do the right thing for G.'s physical and emotional health. Her behavior puts G. in the position of a child without the proper parental care necessary for his physical, mental or emotional health. Mother needs to take action to place herself in the position of being able to care for G.. Without that action, G. is at risk while living with her.

The requirements of the definition of "dependent" have been met. G. has been without appropriate parenting from both parents defined in the statute. G. is a dependent child.

Issue 2

Appellant contends that the Court erred in allowing Mother to be called as a witness by the Agency as if she were on cross-examination, thereby compelling her to testify against her interest. The Court is unaware of any applicable rules or statutory sections which direct that a party in a dependency matter cannot be called on cross-examination when the expected testimony is negative to that party's case. The procedure of calling a party as if on cross examination is governed by Pennsylvania Rule of Evidence 611. The applicable section of Rule 611 reads, in relevant part:

(b) ..........A party witness in a civil case may be cross-examined by an adverse party on any matter relevant to any issue in the case, including credibility, unless the court, in the interests of justice, limits the cross-examination with respect to matters not testified to on direct examination.

14

(c). Leading Questions.  Leading questions should not be used on direct or redirect examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:

(1) on cross-examination; and

(2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.  A witness so examined should usually be interrogated by all other parties as to whom the witness is not hostile or adverse as if under redirect examination.  As can be seen, there is no restriction on asking a hostile witness for testimony which might be against his or her interest.  The comment to section 611©) similarly does not address such an issue.  A review of the rules governing the juvenile matters produces no such restriction. In fact, the phrase "testimony against interest" is the name of an exception to the hearsay rule which holds that hearsay testimony against a witness's  interest has an earmark of validity.

This is not a criminal matter, in which the scope of the defendant's testimony is governed by the 5th and 14th amendments of the United States constitution and his right not to testify against him or herself.  The portion of the Juvenile Rules dealing with Juvenile Delinquency specifically states that "unless otherwise specifically provided, these rules shall not apply to domestic relations proceedings and dependency proceedings."  The Superior Court has also made a distinction between criminal matters and dependency matters, saying that "in a dependency case, the liberty interest of [a parent] is not at stake and the risk of erroneous adjudication is so substantially mitigated by safeguards, reviews, and procedures directed toward uniting the family, that due process requires a less didactic approach than in criminal procedures......And,

15

while a dependency proceeding is adversarial in the sense that it places the stat e in opposition to the parent with respect to the custody of the child ... it does not implicate the liberty interests of the parent or the child as would be the case of a defendant in a criminal action." *In re M.B.*, 869 A.2d 542, (Pa.Super, 2005) citing *In re J.P.*, 573 A.2d 1057 Pa.Super, 1990).

## Issue 3

Appellant also complains that a caseworker was permitted to testify as to Hershey Medical Center's concerns about G.'s missed medical appointments. Appellant is mistaken in this complaint. The testimony about G.'s missed medical appointments was presented by Natalie Krak, an Agency caseworker. Her testimony also included information obtained in a meeting with Dr. Alexander, G.'s gastroenterologist. This is all found beginning on Page 42 of the hearing of August 10. An examination of the transcript fails to find any objection made by Appellant's attorney to Ms. Krak's testimony. Rule 302 of the Pennsylvania Rules of Appellate Procedure provides, in relevant part:

> Rule 302. Requisites for Reviewable Issue
> (A) General rule. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.

Having failed to object at trial, Appellant has waived her right to raise the hearsay issue as to Ms. Krak's right to testify as to missed medical appointments and G.'s medical status and history.

Ms. Krak was Appellant's witness. In his direct examination, Ms. Krak was asked questions that called for hearsay answers without objection. On cross examination, attorneys for the other parties asked similar questions, without objection. The Court

16

never had an opportunity to rule on any aspect of Ms. Krak's testimony. The issue raised by Appellant in her Concise Statement is therefore waived for this appeal.

## CONCLUSION

For the reasons set out above, the Court affirms its decision that G. is a dependent child, and that the evidence appropriately indicates that it was in his best interest to remove him from his parent's home.

BY THE COURT:

LESLIE GORBEY, JUDGE

DATED: October 1, 2015

Attest:

Copies to:
Justin C. Gearty, Jr., Esquire
David J. Natan, Esquire
Daniel H. Shertzer, Jr., Esquire
Jeffrey S. Shank, Esquire

I certify this document to be filed in the Lancaster County Office of the Clerk of the Courts.

Joshua G. Parsons
Clerk of the Courts

17